JESSE R. STARNES v. R. R. HILL.

*Contingent and Vested Remainders—Shelley's Case.*

1. A limitation to M. J. P. for and during the term of her natural life, and in the *event* that R. O. P. shall outlive her, then to him for and during the term of his natural life, and after the termination of the said life estates then to the heirs of R. O. P.: *Held*, that R. O. P. takes a contingent remainder, and that until the happening of the contingency the rule in Shelley's case cannot operate so as to vest in him an indefeasible fee.

2. That, should R. O. P. fail to survive M. J. P., his heirs will take as purchasers, no estate having vested in their ancestor, the word "heirs" being *descriptio personarum*.

3. The rule in Shelley's case has not been abolished by section 5, chapter 43, of the Revised Code, and section 1329 of the present Code.

(Syllabus by the Court).

(Discussion by SHEPHERD, C. J., of contingent and vested remainders, and the rule in Shelley's case).

CIVIL ACTION for specific performance, tried at September Term, 1892, of BUNCOMBE Superior Court, upon a case agreed, before *Bynum, J.*

The case agreed is as follows:

It is agreed that the facts set forth in the complaint in this cause are true; and it is agreed that the facts set up as matters of defense in the answer are true, as also are the matters alleged in the reply. And all the pleadings are referred to and made a part of this case.

It is further agreed that C. A. Moore, Robert O. Patterson and his wife are all living at this time, and that said Patterson and wife have several living children.

The deeds herein referred to are copied in and are a part of the pleadings, and the fee-simple of the land in question was in William A. Holland and wife at the date of their said deed, and they were also seized in fee on the —— day of July, 1874, when they contracted to sell the land to R. O. Patterson, who is identical with Robert O. Patterson, whose name appears in the deeds.

It is further agreed that the consideration money was paid by Robert O. Patterson to William A. Holland and wife on or before the second day of April, 1875, when their said deed was made to C. A. Moore, trustee, and others.

The question intended to be presented by this case agreed is, whether C. A. Moore, trustee, and Robert O. Patterson and wife, Madara J. Patterson, had the power, under the deed of William A. Holland and wife, Mira McD. Holland, of date the second day of April, 1875, to pass the fee-simple in the land in question, as they undertook to do by their deed of the 21st day of March, 1878. If they were able to pass the fee-simple, and did pass it by their said deed, or if the same passed by operation of law, then the plaintiff shall recover, and the defendant shall accept the plaintiff's deed and pay the purchase money agreeably to said contract; otherwise, the defendant shall recover his costs and be discharged from his obligation to purchase the land in question.

The deed from William A. Holland and wife, the construction of which is the subject of this controversy, is as follows:

THIS INDENTURE, made this the 2d day of April, A. D. 1875, between William A. Holland and wife, Mira McD. Holland, of the county of Buncombe and State of North Carolina, of the first part, and C. A. Moore, trustee, of the second part, witnesseth:

THAT WHEREAS, on the — day of July, 1874, the said William A. Holland and wife, Mira McD. Holland, bargained and sold to R. O. Patterson, for and in consideration of one thousand dollars ($1,000), to them in hand paid on said last named day, the lot hereinafter described, and by writing under their hands and seals agreed to convey to the said R. O. Patterson by good and sufficient deed the same; and whereas, the purchase money has been paid in full, and the said R. O. Patterson has directed that the deed be made to C. A. Moore, the party of the second part, for said lot for the use and trusts and purposes hereinafter mentioned :

NOW, THEREFORE, in consideration of the premises and the further consideration of the sum of one dollar to said parties of the first part in hand paid by the said party of the second part, the said parties of the first part do hereby give, grant, bargain, sell and convey, and by these presents have bargained, sold and conveyed unto the said party of the second part, and his heirs forever, a certain lot in the town of Asheville, etc.    (Here follows the description).

To have and to hold to the said party of the second part and his heirs forever.   In special trust and confidence, however, that the said C. A. Moore and his heirs will hold the same to the use of Madara J. Patterson for and during the time of her natural life, and in the event that the said R. O. Patterson shall outlive his said wife, Madara J., that

the said C. A. Moore and his heirs will then hold the same to the use of said R. O. Patterson for and during the term of his natural life, and after the termination of the said life estates, that the said C. A. Moore and his heirs will then hold the same to the use of the heirs of the said R. O. Patterson and them and their heirs forever.

And the said William A. Holland and wife, Mira McD. Holland, for themselves and their heirs, do hereby covenant to and with the said C. A. Moore and his heirs, that they are seized in fee-simple of the said premises, and that they have right and full power to convey the same, and that the same is free from all incumbrances, and they do further covenant for themselves, and for their heirs, to and with the said C. A. Moore and his heirs, that they will warrant and defend the title to the said premises against the lawful claims of all persons whatsoever.

IN WITNESS WHEREOF, the said parties of the first part, and C. A. Moore, trustee as aforesaid, have hereunto set their hands and seals, the day and date above written.

WM. A. HOLLAND,       (Seal.)

MIRA McD. HOLLAND,   (Seal.)

C. A. MOORE,            (Seal.)

On the 21st of March, 1878, the above described land was conveyed for a valuable consideration by C. A Moore, trustee, and said Robert O. Patterson and wife, Madara J., to one F. E. A. Roberts in fee, the deed containing the following covenant: " And the said Robert O. Patterson, for himself and his heirs, covenants to and with the said F. E. A. Roberts and his heirs, that he and the said Madara J., his wife, and the said C. A. Moore, trustee as aforesaid, are seized in fee of said lands and have the right to convey the same, and the said Robert O. Patterson, for himself and his heirs, for the consideration aforesaid unto the said F. E. A.

Roberts, his heirs, will forever warrant and defend the title to the said lands against the claims and demands of all other persons whatsoever."

It further appears that the plaintiff thereafter purchased the said land of the said Roberts, and on the 16th of October, 1891, entered into a contract with the defendant whereby the defendant contracted to purchase the same of the plaintiff for the sum of twenty thousand dollars, executing his note to plaintiff for said sum, payable on the 18th of November, 1891.

This action is brought by the plaintiff to compel specific performance of the contract, and the defendant resists the same on the ground that the plaintiff is unable to execute to him a title in fee to the premises, alleging in his answer "that the title to the land acquired by the plaintiff, and offered by the plaintiff to this defendant, is materially defective and imperfect, and that the plaintiff, on account of said defects, *has no valid title whatsoever* to said land, and cannot specifically perform his agreement to convey to this defendant said lot of land by a good, perfect and valid title, and that therefore the defendant ought not, in equity and good conscience, to be compelled to specifically perform his contract to purchase the land, and to pay said note for twenty thousand dollars executed for the purchase money thereof."

The plaintiff in his reply alleged that the whole of the purchase money expressed in the deed to C. A. Moore was paid by said R. O. Patterson. His Honor rendered judgment against the defendant, and decreed that he specifically perform the contract, and from this judgment the defendant appealed.

W. W. *Jones*, for plaintiff.

*Gudger & Martin*, for defendant (appellant).

SHEPHERD, C. J.: It is well settled that "in limitations of a trust, either of a real or personal estate, * * * the construction of limitations ought to be made according to the construction of limitations of a legal estate unless the intent of the testator or author of the trust plainly appears to the contrary." Fearne Cont. Rem., 125.

As there is nothing in the deed from W. A. Holland and wife to C. A. Moore, trustee, from which we are at libery to infer an intention that the terms therein employed were to be understood in any other than their technical sense, it must follow, in accordance with the foregoing principle, that the limitations under consideration must be determined by the rules of the common law applicable to limitations of a strictly legal character. Under the provisions of the deed the said C. A. Moore was seized in fee to the use of Madara J. Patterson during her natural life, and *in the event* that R. O. Patterson should outlive the said Madara, his wife, then to the said R. O. Patterson for and during the term of his natural life, and after the determination of the said life estates, then "to the use of the heirs of said R. O. Patterson and them and their heirs forever." The deed under which the plaintiff claims purports to convey a fee-simple, and was executed by the said trustee and Madara J. and R. O. Patterson, all of whom, together with several children of the said Patterson and wife, are now living.

We are called upon to define the interests of the various parties under the said limitations, and more especially to determine whether the parties to the deed just mentioned could convey an indefeasible fee in the premises. It is insisted by the plaintiff that R. O. Patterson took a vested remainder for life and that, as the limitation over was to his heirs, he was, under the rule in Shelley's case, seized of an absolute estate in fee-simple. On the other hand, it is argued by the defendant that the life estate of the said Pat-

terson was contingent upon the event of his surviving his
wife, and that until the happening of such event no interest
vested in him which, under the said rule of law, could unite
with the inheritance so as to destroy the remainder limited
to his heirs, who would take as purchasers if he failed to
survive his said wife.

In support of the plaintiff's contention we are referred
to the principle laid down by Mr. Fearne (*supra*, 217) in a
passage which has often been quoted in text-books and judi-
cial opinions, but seldom accompanied with the explana-
tion of the learned author in its immediate connection.
*Ibid.*, 216, 217.   The language is as follows : " The present
capacity of taking effect in possession, if the possession were
to become vacant, and not the certainty that the possession
will become vacant before the estate limited in remainder
determines, universally distinguishes a vested remainder
from one that is contingent." It is urged, that inasmuch
as the death of Madara J. is an event which must happen,
and as R. O. Patterson is a person *in esse*, the latter would
have the capacity of taking the possession, should the pre-
ceding estate of the said Madara J. be presently determined
by her death, and therefore, under the foregoing rule, his
estate would be a vested remainder.   The fallacy of the
argument may be found in the failure to observe that at
common law the particular estate may be determined dur-
ing the life-time of its tenant (as by forfeiture or surren-
der, Fearne, *supra*, 217 ; Tiedman Real Prop., 401 ; 4 Kent
Com., 254), in which case it is entirely clear that the remain-
der to R. O. Patterson would be defeated, because the *event*
upon the happening of which his interest was to vest, to-wit,
the survival of his wife, would not have transpired during
the continuance of the particular estate (Fearne, 217; 2
Minor Inst., 170, 171), and it is common learning that
the contingency must happen during the continuance of

the particular estate, or *eo instanti* it determines.    2 Blk.
Com., 168.

If it be granted for the purposes of this argument that
no merger or surrender can have the effect of destroying
the particular estate in this instance, and if it be said
that under the modern system of tenures such estate may
no longer be forfeited as in feudal times, the answer is that
the rule which distinguishes a vested from a contingent
remainder has for centuries been a rule of property of the
common law, and "to disregard rules of interpretation sanc-
tioned by a succession of ages and by the decisions of the
most enlightened judges, under pretence that the reason of
the rule no longer exists, or that the rule itself is unreason-
able, would not only prostrate the great landmarks of prop-
erty, but would introduce a latitude of construction, bound-
less in its range and pernicious in its consequences."    4
Kent Com., 231.    "We have many laws, the origin of
which cannot at this distant period be traced at all; yet
justly should we laugh at the man urging that as an argu-
ment against the present validity of such laws; and surely
a law for which no reason at all now appears has no more
original ground in the present state of things than a law
whose origin may be traced up to a circumstance which
does not now exist."    Fearne, *supra*, 87.

In *Perrin* v. *Blake.* (1 W. Bl., 672, and note i ; 4 Burrows,
2579), Judge BLACKSTONE remarked : "There is hardly an
ancient rule of property but what had in it more or less of
feudal tincture," and, after instancing several, he observes
that "whatever their parentage was, they are now adopted
by the common law of England, incorporated into its body
and so interwoven into its policy, that no court of justice
in this kingdom had either the power or (he trusted) the
inclination to disturb them."

In view of the fact that, except where changed by statute,
the rule of the common law which we have been discussing

is generally recognized and acted upon in all its rigor, regardless of the fact that some of its reasons no longer exist, there can be no serious doubt of the entire applicability of the language of the distinguished jurists from whom we have quoted. It may be observed, in this connection, that waste is still recognized by the laws of this State as a ground of forfeiture. *The Code,* §624; *Sherrill* v. *Connor,* 107 N. C., 630.

We return to the rule as laid down by Fearne. This may be illustrated by a limitation to A for life, and then to B for life. Now, here B may die before A, in which event he would never actually enjoy the possession, but during his life he has "a fixed right of future enjoyment" (4 Kent Com., 203) which, upon the determination of A's estate, whether by death or otherwise, entitles him to the immediate possession irrespective of the concurrence of any collateral contingency, and his remainder is therefore vested. In other words, the term " vested remainder " imports *ex vi termini* " a *present* title " in the remainderman. So that if the limitation in the above illustration had been to B and his heirs, the latter would have taken although B had died before A. In Gray on Perpetuities, 63, the learned author thus distinguishes a vested from a contingent remainder: " A remainder is vested in A when, throughout its continuance, A, or A and his heirs, have the right to the immediate possession, *whenever and however* the preceding estates determine, or, in other words, a remainder is vested if, so long as it lasts, the only obstacle to the right of immediate possession by the remainderman is the existence of the preceding estates; or again, a remainder is vested if it is subject to no condition precedent, save the determination of the preceding estates." Fearne, 217 ; 1 Cruise Real Prop., 211 ; Tiedman Real Prop., 401 ; 2 Washburn Real Prop., 595.

In accordance with these principles Blackstone (2 Vol.,

171) puts a case " on all fours " with the one before us, and declares the limitation to be a contingent remainder. " A remainder (he remarks) may also be contingent where the person to whom it is limited is fixed and certain but the *event* upon which it is to take effect is vague and uncertain; as where land is given to A for life, and in case B survives him, then with the remainder to B in fee; here B is a certain person, but the remainder to him is a contingent remainder, depending upon a dubious event, the uncertainty of his surviving A. During the joint lives of A and B it is contingent, and if B dies first, it can never vest in his heirs, but is forever gone. But if A dies first, the remainder to B becomes vested." 1 Cruise, *supra*, 205; Boone Real Prop., 174; *Bamforth* v. *Bamforth*, 123 Mass., 282.

It is true that the law favors the vesting of estates, and in many instances the Courts have construed limitations to be conditions subsequent instead of conditions precedent. Thus, " on a devise to A for life, remainder to his children ; but if any child dies in the life-time of A, his share to go to those who survive; the share of each child is said to be vested subject to be divested by its death. But on a devise to A for life, remainder to such of his children as survive him, the remainder is contingent." Gray, *supra*, 108. The distinction, says the same author, is that " if the conditional element is incorporated into the description of the gift to the remainderman, then the remainder is contingent; but if after the words giving a vested interest a clause is added divesting it, the remainder is vested." Several of the authorities cited by counsel fall within the latter branch of the proposition and clearly have no bearing upon this case, as no ingenuity is equal to the task of construing the present limitation as one vesting a present interest subject to be divested upon a condition subsequent. It is plain that if it vests at all, it must remain vested. The cases cited

from our Reports do not in the least impinge upon the principle we have stated. In *McNeely* v. *McNeely*, 82 N. C., 183, · a testator, "after devising to his wife for life, gave all the lands 'that I have to my son Billy, at the death of his mother, by him seeing to her.'" The Court held that the words "by him seeing to her" were not operative as a condition precedent, but was the mere expression of a wish that he should take care of his mother. It was therefore properly held to be a vested remainder. In *Brimson* v. *Wharton*, 8 Ired. Eq., 80, the decision was influenced entirely by the construction of the will. It was declared that the testator intended to give the property to his wife during her life and then to his children, to be equally divided between them, with a proviso that, if his wife should marry, her particular estate in the whole should determine and she would be entitled to a child's part. Under this construction, it was of course held that the children took a *present interest* to be enjoyed in the future, that is, after the determination of the estate given to the wife, subject only to the contingency of letting in the wife as to one share of the particular estate determined by her marriage. "This contingency (says the Court) not having happened is out of the case, and it is the ordinary one of a gift to a widow for life, and then to the children to be equally divided." We are unable to see how this case is authority for the position that a remainder limited upon a precedent condition can be vested until such a condition is fulfilled. In *Rives* v. *Frizzle*, 8 Ired. Eq., 237, the Court simply decided that the words "after" or "upon" the death of a person "do not make a contingency, but merely denote the commencement of a remainder in point of enjoyment." There could hardly be found in the language words which more aptly express a contingency than those used in the present case. In *Elwood* v. *Plummer*, 78 N. C., 392, the land was devised in trust for "two of the

testator's daughters during their natural life-time, to be
equally divided, and after the death of either, in trust in
part for her three grandchildren until the death of the other
daughter, at which time said plantation is to be equally
divided between said three grandchildren, of whom R. A.
Plummer was one." The Court said that "both the object
of the gift and the event of its full enjoyment are certain,
which makes a vested remainder." Here there was no con-
dition precedent to the vesting of the remainder, and there
was a present capacity to take effect upon the determination,
in whatever manner, of the life estates. We cannot see
how any of these decisions are in point. Neither do we find
anything in the other cases, to which we have been referred,
that can be regarded as authority against so well settled a
principle of the common law as that which we have stated.

In *Croxall* v. *Sherard*, 5 Wall., 288, cited for plaintiff, it
was said that " where an estate is granted to one for life, and
to such of his children as should be living after his death, a
present right to future possession vests at once in such as
are living, subject to open and let in after-born children,
and to be divested as to those who shall die without issue."
Similar decisions were made by the Supreme Courts of Ala-
bama and Illinois, and all of them have been severely criti-
cized by eminent authority. Mr. Gray (*supra*, 107, note 2)
suggests that in these cases " an expression of opinion upon
the point in question was not really necessary to a decision
upon the merits. At any rate (he remarks) it would seem
that these decisions, as well as those in Indiana and New
York, present an exceptional view of the common law con-
ception of a remainder in other jurisdictions." While the
cases are not directly in point, it may be well to add that their
reasoning seems to be identical with the New York decis-
ions, based upon statutory definitions and in reliance upon
Chancellor Kent's statement that the statutory definition

expressed the common law notion of a vested remainder. Mr. Gray (*supra*) further remarks that it is doubtful whether such legislation was intended to change the common law; but he says "the Courts have decided, and it would seem correctly, that it has done so." This latter view seems to be the correct one (*Moore* v. *Littell*, 41 N. Y., 66), and therefore destroys the force of decisions based upon or influenced by such statutory definitions, and practically leaves nothing which -seriously conflicts with the common law principles which we have enunciated.

We are therefore of the opinion that R. O. Patterson took but a contingent remainder, and that until the happening of the contingency, the rule in Shelley's case could not operate so as to defeat the contingent remainders of his heirs as purchasers. Granting, however, that the limitation could possibly be construed to vest in him a present interest so as to put in operation the rule in Shelley's case, still he would take but a defeasible estate, as under all of the authorities his failure to survive his wife would operate (if we can venture to use the expression in reference to such a limitation) as a condition subsequent, by which his estate would be divested in favor of the said heirs. So, treating the limitation either way, the plaintiff has not acquired such an absolute estate in fee as is necessary to enable him to comply with the terms of the contract which he seeks to enforce against the defendant.

It may further be observed that the position that the warranty in the deed of the life tenant can defeat the remainder of the said heirs by way of rebutter, is wholly untenable. *The Code,* §1334; *Moore* v. *Parker,* 12 Ired., 123.

2. We will now endeavor to ascertain the interests of the parties in the event that R. O. Patterson should survive his wife, and, while under the view we have taken, we might abstain from doing so, yet, as the answer denies that the

plaintiff has any " valid title whatever to the land," and the parties may be left somewhat at sea in respect to their rights under the limitations in the deed, and a construction at this time may avoid future litigation, we have concluded to proceed further in the discussion and pass upon the remaining questions presented in the record.    We are all the more inclined to pursue this course because it involves the consideration of a question which was thoroughly argued by counsel, and the determination of which is of serious interest to the profession.

The question is whether the rule in Shelley's case still obtains in North Carolina?    It is insisted that this ancient rule of law was abolished in 1854 by section 5, chapter 43, of the Revised Code, which provision was brought forward and now constitutes section 1329 of the present Code.    As the existence of the rule has for many years been unquestionably recognized in North Carolina as one of the "ligaments of property" (the only doubt upon the subject having been suggested by *dicta* of comparatively recent date), and under it many titles have vested and been transferred, the question now presented is one of very great importance and demands the most serious consideration of the Court. Before attempting a construction of the provision referred to, it may be well to make some general observations upon the probable origin and policy of the rule in order to ascertain, if we can, whether it be in accord with the general current of enlightened jurisprudence in modern times and more especially with the policy of our own laws.    It is believed that such an inquiry may lend us valuable aid in our efforts to discharge the delicate and responsible duty of interpreting the legislative will.

The rule under consideration takes its name from an early case decided in the reign of Queen Elizabeth (Shelley's Case, 1 Rep., 94), though it was at that time considered as.

an ancient dogma of common law and has been traced by Justice BLACKSTONE to a case decided in the reign of Edward II. The earliest intelligible decision upon the subject, however, is to be found in the case of the Provost of Beverly, in the time of Edward III., and reported in the Year Books, in which the rule is substantially declared as in Shelley's case. Various theories have been suggested as furnishing a reason for the rule in the first instance, some authors with much plausibility tracing it to the same principle which applied originally to "heirs" when used in a conveyance. "It was at first understood that, in case of such a limitation, the estate was in fact to go to the heirs of the grantee named; that though he had a right to enjoy it during life, he had no right to cut off the descent by alienation, and that when, therefore, the word 'heirs' in the progress of estates came to be regarded as a mere term of limitation, giving the grantee a complete ownership with an unrestricted right of alienation, it was not easy to distinguish between a case where the limitation was to one and his heirs, and that where it was to him for life, and after his death to his heirs, the effect at common law being the same in both forms of limitation." 2 Wash. Real Prop., 647; Williams Real Prop., 254.

Nor does it seem that this result worked any particular hardship to the heir, as in those days ready money was extremely scarce and the alienation of lands assumed the form of perpetual leases, granted in consideration of certain services or rents reserved to the grantor and his heirs; and, as such services or rents descended to the heir, it was not so great a disadvantage to him as at first might be supposed. Williams Real Prop., 39.

It is not to be doubted that this construction was aided and greatly strengthened by other considerations such as the prevention of frauds upon feudal lord and specialty

creditors (2 Fearne, ch. 12, sec. 3), the prevention of the inheritance from being, as was supposed, in abeyance (Justice BLACKSTONE'S argument in *Perrin* v. *Blake*, in Ex. Chamber, 2 Burr., 11,000), and to preserve the marked distinction between title by descent and purchase. Hargrave Law Tracts. "But whatever may have been the grounds of the rule in its origin, another reason subsequently existed as an inducement to the preservation of the rule from legislative abolition and judicial discouragement, after the feudal reason had ceased with the feudal system itself, and that subsequent reason is the *desire to facilitate alienation* by vesting the inheritance in the ancestor, instead of allowing it to remain in abeyance until his decease." 2 Fearne, sec. 421.

In *Perrin* v. *Blake, supra,* Justice BLACKSTONE said: "Another foundation of the rule probably was laid in a principle diametrically opposite to the genius of feudal institutions, namely, a desire to facilitate the alienation of land, and to throw it into the track of commerce one generation sooner by vesting the inheritance in the ancestor." See, also, Rawles' Note, Williams Real Prop., 253.

In *Polk* v. *Farris*, 30 Am. Dec., 400, REESE, J., in a very able opinion in vindication of the rule, uses this language: "It is a rule or canon of property, which, so far from being at war with the genius of our institutions or with the liberal and commercial spirit of the age, which alike abhor the locking up and rendering inalienable real estate and other property, seems to be in perfect harmony with both. It is·owing, perhaps, to this circumstance that the rule, a gothic column found among the remains of feudality, has been preserved in all its strength to aid in sustaining the fabric of the modern social system." In *Hillman* v. *Bauslaugh*, 53 Am. Dec., 474, the distinguished Chief Justice GIBSON says: "Though of feudal origin, it is not a relic of barba-

rism, or a part of the rubbish of the dark ages.    *   *   *
It has other than feudal objects, to-wit, the unfettering of
estates, by vesting the inheritance in the ancestor and making
it alienable a generation sooner than it otherwise would be."

That this result accords most thoroughly with the general
tendency of juridical evolution is apparent from the prog-
ress of the law and the gradual falling away of entails
and other restraints on alienation from the times of Henry I.
to the present.    It seems clear that in a highly complex
state of society, with greatly diversified industries and
immense commercial activities, it would be desirable to
remove every clog on the free and easy alienability of all
kinds of property, and that such has been the spirit of the
legislation in this State is manifest from a perusal of the
various statutes enacted upon the subject.

We are not unaware of the fact that in some of the States
the rule has been partially, if not wholly, abolished.    Such
legislation was probably influenced by the presumed lack of
conformity with the supposed intention of the grantor or tes-
tator; but to this it has been answered that "when a case
arises fulfilling the requirements for the application of the
rule, it is not against the *intention* of the testator.    It is only
applicable when the intention of the testator has been dis-
covered by the ordinary canons of descent."    2 Fearne, sec-
tion 434.    "The rule is not a means to *discover the intention*
of the grantor or testator, but, supposing the intention ascer-
tained, the rule *controls* it, so far as it is repugnant to the
policy of the law, giving effect to the *general and legal,* rather
than the more particular and prescribed, intent.    The party
making such a limitation has in his mind two purposes,
which are legally in conflict.    One is to give the ancestor
only a life estate; the other, to limit the land to his heirs
collectively, and in indefinite succession.    These two intents
cannot stand together without more or less of general mis-

chief to the public welfare, and the rule prevails simply to subordinate the particular and apparently less important design of limiting the ancestor's interest to a life estate, to the more comprehensive, and probably the preferred, purpose of transmitting the inheritance in the manner indicated." 2 Minor Inst., 395, cited with approval in *Leathers* v. *Gray*, 96 N. C., 548.

As the Courts are astute in discovering the intention from the context of the conveyance and readily give effect to every word from which such intention can reasonably and legitimately be inferred, it does not often occur that the application of the rule has the effect of subverting the real intention of the grantor or testator. But granting that it does, it is urged with great force that particular instances of hardship can better be endured than the uncertainty and confusion of titles resulting from sudden and radical changes in well-settled rules of property. In reference to this very question, Chancellor Kent remarks that "it is a question for experience to decide whether the attainable advantages suggested by a change in the law will overbalance the inconvenience of increasing fetters upon alienation and shaking confidence in law by such an entire and complete renunciation of a settled rule of property memorable for its antiquity and for patient cultivation and discipline which it has received." 4 Com., 233. "Certain established maxims as to the legal import and effect of technical expressions will render the decisions of titles to property as little dependent as the nature of things will admit upon the occasional opinion, humor, ingenuity or caprice of the Judge, and are therefore the most proper and sure grounds for titles to rest and depend upon. Titles so founded may be easily and clearly ascertained; and under them a permanent peaceful enjoyment may be expected." 1 Fearne, 171

It may be further observed that the rule in Shelley's case

is by no means the only principle of law which may thwart the intention of the grantor or testator in the interest of public policy; as for instance, the intention cannot change the rule against perpetuities, nor impose a general restraint upon alienation. If the views of the eminent jurists and authors from whom we have so liberally quoted be sound, there is certainly no reason for looking upon the rule with disfavor, but, on the contrary, it is highly useful, and should be jealously guarded and preserved.

But whatever may be the better policy (and this it is not our province to determine), its great antiquity and general prevalence, as well as its earnest endorsement by so many great lawyers of the present as of past centuries, should alone be sufficient to entitle it to a fair and patient hearing when the question of its abolition arises upon the construction of a statute which, for the particular purpose for which it is now invoked, must be regarded as obscurely worded and sufficiently ambiguous to admit of an entirely different application.

This "ancient landmark of the law" was, we believe, on a celebrated occasion, shown but slight respect by so great a Judge as Lord Mansfield, but the controversy which immediately sprang up between his Lordship and Mr. Fearne did not, it is said, result to the advantage of the former, and the rule was more firmly settled than ever in the jurisprudence of England. See Campbell's Life of Mansfield.

We will now attempt a construction of the act in question:

"Any limitation by deed, will, or other writing, to the heirs of a living person, shall be construed to be to the children of such person, unless a contrary intention appears by the deed or the will." Rev. Code, ch. 43, §5; *The Code*, §1329.

The word "limitation" has two well-known and distinct meanings: in the one, the primary meaning, it signifies a

marking out the bounds or limits of the estate created; in the other, it signifies simply the creation of an estate (2 Fearne, §24), and it is evidently used in the secondary sense in the above act. It will appear hereafter that its framers had a very definite purpose in view, and it seems that, in effectuating this purpose, they endeavored to avoid any interference with the rule in Shelley's case. This must be apparent, because the rule has nothing whatever to do with limitations to the heirs of a person *unless there is a precedent limitation of a freehold estate to that person,* and yet the act does not make the slightest reference to this essential element of the said rule. It is impossible to suppose that the gentlemen who prepared the Revised Code and incorporated this section, should have been inattentive to this defect if it had been their purpose to abrogate the rule. Their abilities and learning need no eulogy from us; they are a part of the heritage of the legal profession of this State, of which we may be justly proud. And this is a point which may be very strongly insisted upon, that if these Commissioners had intended to abolish the rule, they could have done it and would have done it in such a manner as to leave no doubt upon the subject. That there is a doubt is the most powerful reason for sustaining the rule. Acts abridging the common law must be strictly construed (1 Kent Com., 464), "for it is not to be presumed that the Legislature intended to make any innovation of the common law further than the case absolutely required. The law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced, for if the Parliament had had that design, it is naturally said they would have expressed it." Potter's Dwarris, 185; *Brown* v. *Berry,* 3 Dall., 365; *Shaw* v. *Railroad,* 101 U. S., 557.

The very important omission, to which we have adverted,

is rendered still more significant when it is considered that in all of the statutes abolishing the rule, which' we have been able to examine, there is an express reference to the *precedent life estate* given in the same conveyance in which there is a limitation to the heirs of the life tenant. This will strikingly appear from an examination of the statutes, of which we give the following as illustrations:

The Virginia Code (1850) enacts that "when any estate, real or personal, is given by deed or will to any person for his life, and after his death to his heirs, or to the heirs of his body, the conveyance shall be construed to vest an estate for life only in such person, and a remainder in fee-simple in his heirs or the heirs of his body."

In New York it is provided that "when a remainder shall be limited to the heirs or heirs of the body of a person to whom a life estate in the same premises shall be given, the persons who, on the termination of the life estate, shall be the heirs or heirs of the body of such tenant for life, shall be entitled to take as purchasers, by virtue of the remainder so limited to them." 4 Kent, 232.

In Maine, New Hampshire, and several other States in which the rule has been abolished, the statutes, while differing in phraseology, all contain provisions substantially similar to those we have reproduced.

Another argument against the construction contended for is, that in a large number of cases arising under the rule, perhaps the majority, the words of the act *can have no operation.* As an illustration of our meaning, take the case of a limitation to A for life, and after his death to his heirs. A never has any children, and consequently there are no heirs (of that sort) to be construed into children. It is plain that the case must be left as at common law; that is, A will take a fee, In other words, the rule in Shelly's case is applicable to *every case* where an estate is limited to one

for life, with a remainder to the heirs of the first taker, whether the tenant for life has children or not; but the act, by its very terms, can only extend to those cases, if to any, in which the first taker has children.    The alleged abrogation, therefore, is by no means co-extensive with the rule. as is the effect of the statutes to which we have referred, These statutes are framed so as to prevent any enlargement of the life estate even if there be no children, and to confer a *remainder* upon such persons as shall, in any sense, be the heirs of the life tenant.    Can it be inferred that such profound lawyers as our Code Commissioners would attempt to abolish such a well-known and firmly established principle of the common law by an act, the words of which they knew could reach only a few of the great number of cases under the rule, especially when the words can find a much more direct and natural interpretation, as we will presently attempt to show ?

The inapplicability, however, of the words of the act to the rule under consideration, seems to us to be placed beyond question by the fact that they are equally applicable to ordinary limitations in fee-simple; and we do not suppose that any one will seriously contend that the act abolished fee-simple estates generally.    If an estate to A for life, remainder to the heirs of A, he having living children, is converted into an estate for life in A, with a vested remainder in his children by the words of an act which says that "in every limitation to the heirs of a living person, the word heirs shall be construed to mean children," why, may it be asked, does not the same act convert an estate to A and his heirs, he having living children, into an estate in common in A and his children?    Certainly a limitation to A and his children, he having living children, will create a tenancy in common in A and his children, and surely the Commissioners did not intend any such startling result.

Courts will restrain the literal meaning of a statute if its words would extend to cases not intended by the Legislature. *"Scire leges non hoc est verba earum tenere sed vim ac potestatem,* and the reason and the intention of the lawgiver will control the strict letter of the law, when the latter would lead to a palpable injustice, contradiction and absurdity." 1 Kent Com., 462; Potter's Dwarris, 209, note; *Brewer* v. *Blaugh,* 14 Peters, 178; Lieber Hermeneutics, 45.

And here it may not be inappropriate to say that it seems to be the opinion of many of the ablest law-writers that the act does not necessarily abolish the rule. Thus Mr. Washburn, in the fourth edition of his work on Real Property (Vol. 2, 607), undertakes to give a list of the States with reference to the acts which have abolished the rule, and he does not include North Carolina, although he was familiar with our act, as is shown by a reference to section 3, chapter 43, of the Revised Code. The same observation applies to Mr. Rawle, the learned editor of Williams on Real Property. He also gives a list of the States which have abolished the rule, without including North Carolina. The same may be said of Mr. Freeman, the very able and discriminating editor of the American Decisions, in a note to the thirtieth volume Am. Dec., 415, and also of the editors of Jarman on Wills, and Lawson R. & R.

We will now attempt to give our construction of the act. It seems to us that its main object (and its phraseology nicely adapts it to the purpose) was to convert a contingent into a vested remainder under certain circumstances. For instance, an estate to A for life, remainder to the heirs of B, B living and having children: Now, at common law, this created a contingent remainder in the heirs of B, for *nemo est hæres viventis,* and if A died before B, the heirs or children of B took nothing. Under the act in question the children of B would take a vested remainder, and, upon

the death of A, would get the estate whether B was living or not. And it is singular that the only case which we have been able to find in our reports, in which the Court has adjudged the act to be applicable, was similar to this. In *Smith* v. *Brisson*, 90 N. C., 284, the limitation was as follows: "To Rowland Mercer and the heirs of his body, and if the said Rowland Mercer should have no heirs, the said land shall go to the heirs of my son, James A. Mercer." Rowland Mercer died without ever having had children. James A. Mercer was living at the date of the deed and had children at that time, and the Court held that the act (*The Code*, §1329) applied and construed the deed as if the limitation over had read, "the said land shall go to the children of my son James A. Mercer." It seems also to have been the purpose of the act to sustain a direct conveyance to the heirs of a living person. As there can be no heirs during the life of the ancestor, such a conveyance at common law would have been void unless there was something in the deed which indicated "that by 'the heirs' was meant the *children* of the person named." 3 Washburn Real Prop., 282. The act in question provides that in such a case the word "heirs" shall be construed to mean "children," and the limitation therefore would be good.

Our construction that the act does not affect the rule in Shelley's case finds strong support from its position in the Revised Code, which we are at liberty to consider under the maxim *noscitur a sociis*. Indeed, the whole structure of chapter 43 seems to have for its prime object the greater alienability of estates than existed at common law:

Section 1 converts fee-tails into fee-simple estates, and uses no ambiguous terms.

Section 2 converts joint tenancy into tenancy in common.

Section 3 makes certain contingent limitations vest much sooner that at common law; and then comes section 5, the provisions of which we have under consideration.

This object was further advanced by the Act of 1879 (*The Code*, §1280) providing that "all conveyances shall be construed to be in fee-simple unless otherwise plainly expressed," showing plainly the legislative policy. The construction insisted upon by the defendant would, it seems, run counter to the general trend of our policy which favors the early vesting of estates (*Hilliard* v. *Kearney*, Busbee Eq., 221), and it would also place the act entirely out of harmony with its environment.

We do not regard it as serving any useful purpose to refer to the queries thrown out in various cases, extending from *King* v. *Utley*, 85 N. C., 59, to the present time, because the point did not arise and the question is expressly reserved in all of them. It is often remarked that great legislative changes in the law are usually preceded by some decision of the Courts of a novel or striking character, calculated to arrest public attention, and we have made such investigation as we could with a view of discovering such a case as would probably cause the passage of the act. In this we have not been particularly successful. Certainly we find nothing which indicates that Courts, lawyers or laymen were dissatisfied with Shelley's case, or that the question was particularly interesting at that time. We do find a case or two in which the Court applied the rule, but there is nothing unusual to distinguish them from the thousands of similar cases decided within the last four or five hundred years. It is possible, however, that the act grew out of the discussion arising upon the much litigated case of *Ward* v. *Stow*, 2 Dev. Eq., 509, which came several times before the Court and which seems to have established the proposition that in a legacy to the "heirs" of a person, which person *the will itself recognizes as living*, the word "heirs" is to be construed "children." While supported by authority, it seems rather arbitrary that the construction of

the word "heirs" in a will should depend upon whether the will recognizes the ancestor as living, and not upon the *fact* of his being alive. It is not unreasonable to suppose that the discussion in this case may have influenced the action of the Commissioners; but however this may be, we are entirely satisfied from the language used that it was not their purpose to work so great a change in the law governing the limitations of property.

The importance of the question, involving, as it probably does, the validity of the titles to a large amount of real estate, has induced us to discuss the subject at a somewhat unusual length, and we are glad that our conception of the law is in harmony with the views so long entertained and acted upon by the profession.

The rule in Shelley's case being still in force in North Carolina, its application to the present case will be as follows: If R. O. Patterson should survive his wife, he will take a vested equitable freehold estate, and, as the limitations apply to interests of the same quality and the trusts are not executory (Fearne, 51, 55, 90; 2 Thos. Coke Lit., 145), the inheritance will, under the said rule, unite with the said estate, and he will then be seized of an indefeasible equitable estate in fee-simple. This estate will enure to the benefit of the plaintiff by way of feeding the estoppel worked by the covenants of warranty in the deed of the said R. O. Patterson. *Bell* v. *Adams*, 81 N. C., 118; *Southerland* v. *Stout*, 68 N. C., 446; *Fortescue* v. *Satterthwaite*, 1 Iredell, 566; 7 Am. & Eng. Enc., 9, 10, notes.

Until the contingency happens, the "heirs" of R. O. Patterson have a contingent remainder in fee, expectant upon the determination of the life estate of Madara J., she surviving her said husband. In this event they will take, not under said Patterson, but as *purchasers,* the word "heirs" being *descriptio personarum* only.

We think his Honor was correct in holding that the rule in Shelley's case had not been abolished, but, for the reasons given, we think he erred in holding that the defendant was compelled to accept the title offered by the plaintiff.

Error.                                                    Reversed.

Note.—It may not be improper to say that since the preparation of this opinion the writer has been assured by ex-Justice Rodman, the distinguished survivor of those connected with the supervision and publication of the Revised Code, that it was not the purpose of the Commission to abolish the rule in Shelley's case.