W. L. COHOON AND A. E. COHOON v. WILEY UPTON AND WIFE.

(Filed 19 September, 1917.)

1. **Wills—Devises—"Loan."**

    The use of the word "lend" in a devise of land will pass the property to which it applies in the same manner as the use of the word "give" or "devise," unless a contrary intent is manifested by the terms of the instrument.

2. **Same—Heirs of the Body—Statutes.—Rule in Shelley's Case.**

    Under a devise or "loan" of lands to S. and E. "their natural lives, and give to their begotten heirs of their body," etc.: *Held,* the words "heirs of the body" are equivalent to the words "heirs general" (Revisal, sec. 1548), no contrary intention appearing in the other expressions used in the will,

and the specifically named beneficiaries take a fee-simple estate under the rule in *Shelley's case*. The history and interpretation of this rule discussed, and its reason applied, by HOKE, J.

CLARK, C. J., concerning with opinion.

CIVIL ACTION heard on demurrer to complaint before *Kerr, J.,* at July Term, 1917, of CAMDEN.

The complaint alleged that plaintiffs were holders, by proper conveyances, of the estate of Alfred Evans and Rhoda Sawyer, who held the land under the last will and testament of William G. Sawyer, deceased, in terms as follows: "I lend to my sister, Rhoda Sawyer, and my nephew, Alfred Evans, all of my entire estate, both real and personal, after paying my just and honest debts, their natural lives and give to their begotten heirs of their body," etc.

That William G. Sawyer having died, defendants are wrongfully asserting ownership of said land on the ground that the said will only passed to said devisees a life estate in the same.

Defendants demurred and assigned for cause, that, under the terms of said will, Alfred Evans and Rhoda Sawyer only took a life estate, and that defendants' assertion of title was not wrongful.

The court entered judgment sustaining the demurrer, and plaintiffs excepted and appealed.

*Meekins & McMullan for plaintiff.*
*Ehringhaus & Small for defendant.*

HOKE, J. The rule in *Shelley's case* is fully recognized in this State as a rule of property, and in many well-considered decisions, recent and of older date, the statement of the rule appearing in the cases and standard text-writers has been approved and applied to facts directly presenting the question to the Court. *Smith v. Smith,* 173 N. C., 124 (91 S. E., 721); *Revis v. Murphy,* 172 N. C., 579; *Robertson v. Moore,* 168 N. C., 389; *Nichols v. Gladden,* 117 N. C., 497; *Starnes v. Hill,* 112 N. C., 1; *Leathers v. Gray,* 101 N. C., 162.

In some of the later cases, the rule is given from 1 Coke, 104, as follows: "That when an ancestor, by any gift or conveyance, taketh an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee or in tail, the word *heirs* is a word of limitation of the estate, and not a word of purchase."

And from Preston on Estates, approved by *Chancellor Kent* as a full, accurate statement of the rule: "When a person takes an estate of freehold, legally or equitably, under a deed, will or other writing, and in the same instrument there is limitation by way of remainder, either

with or without the interposition of another estate, of an interest of the same legal or equitable quality to his heirs or the heirs of his body as a class of persons to take in succession from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate."

It was established rather arbitrarily as a rule of property under the feudal system for the reason, chiefly, that to construe the word "heirs" in such case as a word of purchase would often have the effect to deprive the feudal lord of certain fees and perquisites accruing to him in case of lands descended, and, as said in the recent case of *Ford v. McBrayer,* 171 N. C., 421, operating not infrequently to defeat the purpose of the grantor or testator as expressed in the instrument, the rule has been abolished by statute in many States of the Union; and in those where it is still allowed to prevail, the tendency is to restrict its application, confining it to those cases where the word "heirs" is used in its technical sense to denote the whole line of heirs to take in succession according to our canons of descent. Accordingly, in many cases in this jurisdiction, the application of the rule has been denied where, from the context or from perusal of the entire instrument, it appeared that the word was used in a more restricted sense, or that it was merely a *descriptio personarum,* designating certain individuals of a class as owners. *Ford v. McBrayer,* 171 N. C., 421; *Jones v. Wichard,* 163 N. C., 241; *Puckett v. Morgan,* 158 N. C., 344; *May v. Lewis,* 132 N. C., 115; *Ward v. Jones,* 40 N. C., 400.

In *Jones v. Wichard* and *Puckett v. Morgan, supra,* the word "heirs" or "heirs of the body" were employed to designate the ultimate takers, but by reason of certain qualifying words in the context it was construed to mean bodily issue in the sense of children and grandchildren, the general position, as a rule of interpretation, being stated in *Jones v. Wichard* as follows: "For the application of the rule in *Shelley's case* to a conveyance to one for life and the heirs of his body, it must appear that the words 'heirs of the body' were used in their technical sense, carrying the estate to such heirs as an entire class to take in succession, with the effect to convey 'the same estate to the persons, whether they take by descent or purchase,' and when it appears from the perusal of the entire instrument that the words were not intended in their ordinary acceptation as words of inheritance, but simply as *descriptio personarum,* designating certain individuals of the class, or that the estate is thereby conveyed to 'any other person in any other manner or quality than the canons of descent provide,' the rule does not apply and the interest of the first taker is an estate for life."

Giving full recognition, however, to the restrictive tendency of these decisions, we find nothing in the provisions of the present will to prevent the operation of the principal rule. In numbers of cases we have

held that the "word 'lend' in a will will be taken to pass the property to which it applies in the same manner as give or devise, unless it is manifest that the testator otherwise intended." *Smith v. Smith,* 173 N. C., 124; *Robeson v. Moore,* 168 N. C., 388; *Sessoms v. Sessoms,* 144 N. C., 121-124.

Under our decisions and by express provision of the statute, the words "heirs of their bodies" are equivalent to the words "heirs general." *Revis v. Murphy, supra;* Revisal, sec. 1548. And there is nothing in the context or general terms of the will that in any way restricts, or tends to restrict, the meaning of the word "heirs" from their usual significance as words of general inheritance.

We are of opinion, therefore, that the rule in *Shelley's case* must be held to apply, and the demurrer of defendants should be overruled.

Reversed.

CLARK, C. J., concurring: The "Rule in Shelley's case" has come before this Court so often that it may not be amiss to say something of the origin and reason for the rule.

The decision was brought about by litigation over a settlement made by Sir William Shelley, a judge of the common pleas, as to an estate which he had purchased at the dissolution of Sion Monastery. Though Judge Shelley died in 1549, the case did not come up for hearing till Easter Term, 1581, and after long argument was decided by an assembly of all the judges presided over by Lord Chancellor Bromley. The rule, therefore, has not come down to us like so much of the "common law" (which is simply judge-made law) with an origin dating back to some obscure and unknown judge whose opinion was repeated by successive judges because some other judge had said the same thing before.

The Reformation in England was caused as much, if not more, by economic reasons than by conflict of religious convictions. It was largely a revolt against the concentration of so great a part of the lands of the realm in the hands of the Church in priories and monasteries. When Henry VIII. procured the dissolution of all these foundations, instead of dividing the lands thus taken back among the people, which would have been an unheard of thing in those days, or even selling them for the benefit of the crown, he divided the most of them among his courtiers. It was either by such donation or by purchase from one who was a donee of the king that this estate came into Judge Shelley's hands.

The object of the rule, the law writers state, was to secure the feudal owners of lands against the loss of wardships and other "rake offs" upon which the feudal lords lived at a time when land was the principal wealth and the foundation of dignity and influence. The rule is a highly technical one, for it contradicts the plain expression of the in-

tent of the grantor or devisor, and could only have been laid down under the pressure of some such motive from a powerful class. It has lead to much litigation, but the feudal lords needed such protection against the loss of those feudal incidents which would have been ousted if the heir of the grantee or devisee had taken as purchaser and not as successor. The rule was first reported 1 Coke Reports, 93 B.

In 1660, at the restoration of the monarchy, one of the conditions exacted for the return of Charles II. was the abolition of all feudal tenures (with a slight exception), and with it the reason of the rule ceased; but having been once laid down, it was continued in England, like so many other outworn things, and was brought over to this country.

The rule at this time serves an excellent but an entirely different purpose in this State, in that it prevents the tying up of real estate by making possible its transfer one generation earlier, and also subjecting it to the payment of the debts of the first taker. It is doubtless for this reason that the rule has never been repealed in North Carolina.

The best work, and probably the only one that has treated the rule with any clearness, is "Contingent Remainders and Executory Devises," by Fearne, the possessor of a wonderfully analytic mind, who treated the whole subject with marvelous clearness. It was written to combat a decision by the great *Lord Mansfield* in *Perrin v. Blake,* and had the effect of reversing that decision.