## C. D. BLACKLEDGE v. F. M. SIMMONS.

### (Filed 8 December, 1920.)

**1. Estates—Rule in Shelley's Case.**

The ancient rule of law in relation to the title to lands laid down in the rule in *Shelley's case* obtains in North Carolina, there being no statutory change therein. The history of this rule, and the reason for it, discussed by WALKER, J.

**2. Same—Wills—"Heirs of the Body"—Children—Purchasers.**

An estate devised to the testator's daughter for life, and at her death unto the "heirs of her body lawfully begotten," and in the event she should die without "heirs of her body," then to the testator's heirs at law: *Held,* the intent of the testator, which controls the interpretation, will be gathered from the terms employed in the will considered as a whole; and the words "heirs of her body" will not be taken in their technical sense, as denoting an entire class of heirs to take as such, in indefinite succession, but as *descriptio personae,* and therefore be construed as the children of the testator's designated child, who take in fee simple as purchasers, and prevents the limitation over to the "heirs" general of the testator.

APPEAL by defendant from *Connor, J.,* at February Term, 1920, of CRAVEN.

This is a civil action to settle the title to the land in dispute, the parties agreeing as to the facts of the case. It will suffice to state as briefly as we can their respective contentions, as they will fully disclose the nature of the controversy.

On 26 January, 1821, Edmond Hatch devised the land in controversy by his will, which is duly recorded in the clerk's office of Craven County, N. C. It is under this will that both plaintiff and defendant claim title.

Item 3 of the will is as follows: "I·give unto my daughter Mary Blackledge, for and during her· natural life, the plantation and land whereon I now live, with 'The Haywood,' and at her death I give the said Haywoods lands unto the heirs of her body lawfully begotten, and in case my said daughter Mary shall die without heirs of her body ˙as aforesaid, then the said Haywood land I give to my heirs at law.

Item 6. "The lands which I have herein given to my daughter Mary during her life is to be in the possession of my executor until the same is paid for by the said Mary; and when the said Mary shall pay for the said lands, that is to say, shall pay the balance I now˙ owe for its purchase, then my said executor shall give up to her its possession."

Plaintiff's claim .of title is as follows:

1. Item 3 of the will of Edmond Hatch, above quoted.

2. Deed by Buckner Hatch and Samuel or Lemuel Hatch to Mary Blackledge, daughter of Edmond Hatch, and wife of William S. Blackledge.

3. Deed from W. S. Blackledge and Mary, his wife, to John H. Bryan.

4. Deed from John H. Bryan to William S. Blackledge.

5. Will of W. S. Blackledge.

6. The plaintiff is the son of R. B. Blackledge named in the foregoing will, Item 3. R. B. Blackledge died 14 January, 1916, and suit was started in November, 1917.

Defendant's claim of title:

1. Will of Edmond Hatch, Item 3, above quoted.

2. R. B. Blackledge and wife by mortgage to W. G. Brinson.

3. W. G. Brinson, mortgagee, by deed to J. L. Hahn.

4. J. L. Hahn, by deed to R. B. Blackledge.

5. R. B. Blackledge mortgaged to A. Hahn.

6. Proceedings of foreclosure, A. Hahn against R. B. Blackledge.

7. L. J. Moore, commissioner, deed to F. M. Simmons.

8. F. M. Simmons has been in possession of the land under the Moore deed since 1887, and has enjoyed solely the rents, profits, and possession since that date.

Plaintiff claims that the defendant, F. M. Simmons, was in possession, holding the life estate of R. B. Blackledge, and that his possession did not become adverse to plaintiff until the death of R. B. Blackledge, on 14 January, 1916, as will more fully appear.

The common source of title is Item 3 of the will of Edmond Hatch, which is quoted above. Edmond Hatch died leaving a daughter, Mary Hatch, and three sons, Buckner, Samuel (or Lemuel), and John. Buckner Hatch and Samuel (or Lemuel) Hatch joined in a deed for this land to their sister Mary, who married R. B. Blackledge, and she and her husband both died in 1856, leaving two children, R. B. Blackledge, the father of the plaintiff, and Virginia Harrison. R. B. Blackledge died intestate 14 January, 1916, leaving him surviving the plaintiff, his son, and three other children. If plaintiff is entitled to recover at all, he is entitled to recover an undivided one-fourth interest in the property, the first and most important question for the consideration of the Court being the proper construction to be placed upon Item 3 of the will of Edmond Hatch.

If the rule in *Shelley's case* applies, then Mary, the daughter of Edmond Hatch, took the fee, as contended by plaintiff, and not a life estate, as contended by defendant.

Her brothers, Buckner and Samuel (or Lemuel) afterwards conveyed to her, and she and her husband, W. S. Blackledge, conveyed to John H. Bryan, and John H. Bryan at the same time reconveyed to W. S. Blackledge, the effect of these deeds being to take the title out of the wife and put it in the husband. W. S. Blackledge then made his will, in which he devised the lands to his son Richard (R. B. Blackledge) for life, and

after his death to be equally divided among his children. If W. S. Blackledge had the fee, then his son, R. B. Blackledge, took only a life estate under the will of his father, and the plaintiff under said will took an undivided one-fourth interest in the property, as he was one of the children of R. B. Blackledge. The plaintiff contends that if R. B. Blackledge only had a life estate, the deeds made by him and his wife above set forth only conveyed a life estate, and that, when the defendant Simmons bought at the foreclosure sale in the proceedings brought by A. Hahn and others against R. B. Blackledge, he only got such estate as R. B. Blackledge had, which was only a life estate under the will of his father, W. S. Blackledge, and that the possession of the defendant since 1887 up to 14 January, 1916, when R. B. Blackledge died, was the possession of a life tenant and did not become adverse to the plaintiff until after the death of R. B. Blackledge in 1916. So the plaintiff contends that the important and material question to be decided by the Court is, "What estate passed under Item 3 of the will of Edmond Hatch?" This item, in brief, gives to Mary Blackledge for and during her natural life the Haywood lands, and remainder at her death unto the heirs of her body lawfully begotten, and in case she dies without heirs, then to the heirs of Edmond Hatch.

Defendant's claim:

1. Will of Edmond Hatch (Item 3 hereinbefore set out).

2. R. B. Blackledge and wife by mortgage to W. G. Brinson.

3. W. B. Brinson, mortgagee, by deed under sale to J. L. Hahn.

4. J. L. Hahn by deed to R. B. Blackledge.

5. R. B. Blackledge, mortgage to A. Hahn.

6. Proceedings of foreclosure in Superior Court, entitled "A. Hahn v. R. B. Blackledge."

7. L. J. Moore, commissioner, deed to F. M. Simmons. Sale made under Blackledge mortgage to Hahn by court decree.

8. F. M. Simmons has been in possession of the land in controversy under the deed from L. J. Moore, commissioner, since 1887, and has enjoyed solely the rents, profits, and possession since that date.

9. In the event plaintiff is entitled to recover, it is agreed that he shall recover a one-fourth undivided interest in and to the lands described in the deed from L. J. Moore, commissioner, to F. M. Simmons, and it is agreed that the value of the rents and profits since 1916 amounts to $400, and that the value of the permanent improvements made by F. M. Simmons on the lands since 1887 amounts to $400. If plaintiff is entitled to recover, that he recover one-fourth of rents and profits to be set off by one-fourth of value of permanent improvements, and that F. M. Simmons is the owner absolutely and in fee simple of three-fourths undivided interest in the lands described in said deed. In the

event plaintiff is not entitled to recover, that the defendant is owner absolutely of the entire interest.

The court gave judgment for the defendant, and plaintiff appealed.

*D. L. Ward for plaintiff.*
*Ward & Ward, Moore & Dunn, and Guion & Guion for defendant.*

WALKER, J., after stating the case: This appeal requires that we should determine again, as this Court has in many similar cases before, whether the rule in *Shelley's case* applies to its facts. This rule is considered to be of the highest antiquity, Judge Blackstone having so stated in his argument of *Perrin v. Blake,* 4 Burr., 2579 (1 Blackstone's Rep., 672; Doug. Rep. (3 ed.), 343, and note 1; Hargr. Law Tracts, 490), and added that the same principle was first established in a case reported as far back as 18 Edward, 2. 1 Fearne on Remainders, p. 85 (4 Am. Ed. and 10 London Ed.). He held it by no means clear that the rule took its rise merely from feudal principles, and was rather inclined to believe that it was first adopted to obviate the mischief of too frequently putting the inheritance in suspense or abeyance. Another foundation of the rule was probably laid in a principle diametrically opposed to the genius of feudal institutions, namely, a desire to facilitate the alienation of land, and to throw it into the track of commerce one generation sooner by vesting the inheritance in the ancestor, than if he continued tenant for life, and the heir was declared a purchaser. It appears that Blackstone held to the latter view, and, upon the whole, he inferred that the rule was of remote antiquity, and was known and applied long before the decision of the case from which it derived its name; that it was not merely grounded on any narrow feudal reason, but applied, in the very first recorded instance, to the liberal and conscientious purpose and policy of making easier the conveyance of the land by charging it with debts of the ancestor. Now, in regard to the rule of law or legal construction, whereby the limitation to the heirs, etc., is executed in the ancestor, though should we admit the reason upon which it first took place no longer to exist, yet the subject of the rule still remains; there are still the same limitations of estates for it to operate upon; and the law having been once so established (no matter upon what ground), the courts of law, who considered themselves as intrusted with the power, not of abrogating or altering old, or enacting new, but only of expounding and pronouncing established laws and legal rules, have, through a long succession of determinations on this point, grounded their judgments upon that rule, as will appear when we come to consider the several cases respecting it. The views stated above are discussed at large by Mr. Fearne in his deservedly famous treatise on the law of Contingent

remainders (4 Am. Ed.), at pp. 80 to 90. He says, at pp. 88 and 89: "But if the admitted antiquity of the rule, if its adoption and prevalence during a period of near five hundred years (reckoning from the case, 18 Ed., 2, cited by Judge Blackstone) have not yet stamped it with legal sanctity, nor entitled it to the attention and observance due to an established rule of law, vain, I am afraid, will be any resort to its origin or principles, at a period when they are confessedly either too remote or too latent for any more energetic influence that what they can derive from the researches of learning or the conception of hypothesis." Reference also may be made to Hargrave's Law Tracts, vol. 1, pp. 498, 500, and 572; 4 Bacon's Abr., 301; 5 Bacon's Abr., 715 and 731; 2 Burr., 1106. There are those, and they are not by any means a few, who regarded the rule as of feudal origin, and that it was introduced to prevent frauds upon the tenure and the lord, or the donor, from being deprived of its fruits, such as the benefits of wardship, marriage, etc., which would have accrued to him upon a descent, but not if the heirs were construed to be purchasers. Judge Blackstone, in the argument of *Perrin v. Blake, supra,* said that "were it strictly true that the origin of the rule in question was merely feudal, and calculated solely to give the lord his profits of tenure, of which (by the by) he had never met with a single trace in any feudal writer; 'still it would not shake the authority of the rule or make us wish for an opportunity to evade it.' There is hardly an ancient rule of real property but what had in it more or less of a feudal tincture." And Mr. Fearne, in that connecting and commenting upon what is there stated, says: "It is true, where those things which are the objects of any rule of law cease to exist, there the rule itself must of necessity cease for want of subject-matter to relate to, or have any effect upon; but it by no means follows that where the same objects of a law still continue, that there the law should cease, only because the very state of things which was the first occasion of it no longer exists. Whilst the same subject continues, there must be still the same necessity for some rule or regulation concerning it. But if the old rule of law were to cease with the circumstance or state of things which gave it birth, the subject would remain at large, unregulated by any law, and exposed to the arbitrary direction of ignorance, partiality, or caprice, until the legislature should interfere and make a new law respecting it. This would be opening a door perpetually to all that uncertainty, confusion, and inconvenience which laws and rules were intended to obviate and prevent. The conclusion is, that every rule of law once established continues to be so, while the subject of it exists, until altered by some solemn act of legislation."

But whether the rule originated the one way or the other, it has always been recognized by us as firmly established in our jurisprudence, and

there are strong reasons why it should remain so, and the one stated by Judge Blackstone is not the least of them.

A very full and satisfactory discussion of the rule in *Shelley's case,* in its several phases, showing its application or nonapplication to various kinds of cases, will be found in *Price v. Griffin,* 150 N. C., 523, and eight other selected cases, reported in 29 L. R. Anno., 935 (N. S.), at p. 935, with an elaborate note, at p. 963. We think it will be disclosed by the note to those cases that many courts have sustained the view taken in this opinion, that in the case of wills the strict enforcement of the rule is not so imperative as, but more liberal than, in that of deeds, greater latitude of construction being permitted in the former.

With this rule of law admitted, let us now inquire how, if at all, it affects this case. The limitation is, "I give to my daughter, Mary Blackledge, for and during her natural life, the land whereon I now live, with 'The Haywood,' and at her death I give said lands to the heirs of her body lawfully begotten, and in case of my said daughter Mary shall die without heirs of her body, as aforesaid, the said Haywood land I give to my heirs at law." A layman in reading this clause might naturally and reasonably infer that the words, "the heirs of her body lawfully begotten," meant her children, and not her heirs generally, who, under the statute of descents, would take in succession to her, from generation to generation indefinitely, because the words "heirs begotten of her body" would in common speech be capable of the meaning that they were the heirs of her body begotten in lawful wedlock, which would describe her legitimate children. It would exclude any illegitimate children who, under certain circumstances, and by virtue of our statute, would, in a restricted way, be her heirs. Consol. Statutes of 1919, ch. 29, Rule 9. The law does not always so regard the limitation, but looks to the entire will to ascertain its meaning. This particular case is controlled by two comparatively recent cases, in which are cited many decisions bearing upon the question, and we need confine our discussion principally to them. There is a limitation over to the devisor's heirs at law, in case Mary should die without heirs of her body, and this was held in *Puckett v. Morgan,* 158 N. C., 344, to indicate that the devisor meant children of Mary, instead of her heirs generally, who would take under the statute of descent. The substance of that decision was, as stated in the head-note, that for a devise of land to come within the meaning of the rule in *Shelley's case,* the subsequent estate must be limited to the heirs *qua* heirs of the first taker, or to the heir or heirs of the body as an entire class or denomination of persons, and not merely to individuals embraced within that class. The rule in *Shelley's case* applies only when the words "heirs" or "heirs of the body" are used in their technical sense, and not when such terms are used as *descriptio*

*personarum.* It will not apply to a devise of lands when, from the instrument, the intention of the devisor can reasonably and legitimately be construed as giving a life estate to the first taker with remainder over to designated persons of a certain class of heirs, as in this case to the "bodily heirs" of M. Therefore, where there was a devise to M. of certain described lands, "during her life, then to her bodily heirs, if any; but if she have none, back to her brothers and sisters"; it was held that M. took only a life estate in the lands, with remainder to her children living at the time of her death, the intention of the testator in the use of the term "bodily heirs," in connection with the other words employed in the devise, being descriptive of a certain class of heirs, upon failure of whom the remainder would go to the brothers and sisters of M. The rule is one of law and not of construction, to ascertain the intention of the testator. It applies where the words are sufficient of themselves to bring the case within it, and there are no explanatory terms giving indication as to how they were intended to be used. Whether the technical heirs were intended by the devisor, or a particular class of heirs, must be determined by a construction of the will or deed under consideration. *Parkhurst v. Harrower,* 142 Pa. St., 432, and to bring a case within the operation of the rule, the limitation must be to the heirs in fee or in tail as *nomen collectivun,* for the whole line of inheritable blood. Theobold, in his work on Wills, 340-342, says that while the rule in *Shelley's case* seems to be applied with greater strictness in England than in this country, even there, when it appears from the context of the instrument that the words are used, not in the technical sense, but as mere *descriptio personae,* they are taken as words of purchase, and not of inheritance, and the rule does not apply. See, also, *Allen v. Pass,* 20 N. C., 212; *Starnes v. Hill,* 112 N. C., 18; *Smith v. Proctor,* 139 N. C., 322. In *Starnes v. Hill, supra, Chief Justice Shepherd* says: "As the courts are astute in discovering the intention from the context of the conveyance, and readily give effect to every word from which such intention can reasonably and legitimately be inferred, it does not often occur that the application of the rule (in *Shelley's case*) has the effect of subverting the real intention of the grantor or testator." In *Puckett v. Morgan, supra,* we held explicitly that where there is a remainder over to another, and different line of descent, upon failure of the heirs of the body, the latter words take the case out of the rule, as they unequivocally indicate the devise in remainder was intended for the children to take, as a class, and not as heirs by descent from their ancestor, the result being that the latter acquire only an estate for life, and her children the fee under the will. The case is sufficiently like this one to control it. Several cases, which were decided in this Court, are cited in support of *Puckett v. Morgan, supra. Rollins v. Keel,* 115 N. C.,

68; *Francks v. Whitaker,* 116 N. C., 518; *Bird v. Gilliam,* 121 N. C., 326; *May v. Lewis,* 132 N. C., 115; *Howell v. Knight,* 100 N. C., 254.

*Justice Hoke* said, in *Radford v. Rose,* 178 N. C., 288, at p. 291: "In that case the devise was to Thomas B. Tyson, 'During the term of his natural life, then to the lawful heirs of his body in fee simple, on failing of such lawful heirs of his body, then to his right heirs,' and it was held that Thomas B. Tyson took an estate in fee as the limitation to the right heirs over did not change the course of descent, and this is true of the will before us, because the plaintiff, being a Rose, if she died without having had children, her heirs and the heirs of her father, the testator, would be the Rose family. And this fact—that the Rose family would be the heirs of the plaintiff if she had no children—marks the distinction between this case and *Puckett v. Morgan,* 158 N. C., 344, and *Jones v. Whichard,* 163 N. C., 244, both of these cases being decided upon the principle that the language of the ulterior limitation carried the estate to a different line of descent, and was sufficient, when read with the other parts of the will, to show that the words 'bodily heirs' were used as a description of the person and not to denote a class who were to take in succession, and therefore that the rule in *Shelley's case* did not apply."

It is said in *Puckett v. Morgan, supra:* "The words 'if any' would be quite appropriate to indicate the possibility of no issue, but not to indicate the contingency of no lawful heirs, for it is rarely possible for one to die without heirs, and not uncommon to die without children. Then again, the reversion over is to a class of heirs at law who would certainly inherit in the event of a failure of issue." So here the same observation may be made, as the first taker would not be likely to die without heirs . by descent from her, whereas she might well die without "heirs lawfully begotten of her body," giving to those words the meaning of children. The case of *Puckett v. Morgan, supra* (opinion by *Justice Brown*), was fully approved in the later case of *Jones v. Whichard,* 163 N. C., 241 (opinion by *Justice Hoke*). It is there said that "in order to its proper application, the word 'heirs' or 'heirs of the body' (these last by reason of our statute, Rev., 1578), must be used in their technical sense, carrying the estate to such heirs as an entire class to take in succession from generation to generation, and they must have the effect to convey 'the same estate to the same persons, whether they take by descent or purchase,' and whenever it appears from the context, or from a perusal of the entire instrument that the words were not intended in their ordinary acceptation of words of inheritance, but simply as a *descriptio personarum* designating certain individuals of the class, or that the estate is thereby conveyed to 'any other person in any other manner or in any other quality than the canons of descent provide,' the rule in question

does not apply, and the interest of the first taker will be, as it is expressly described, an estate for life," citing *Puckett v. Morgan, supra,* and the following cases, not as yet mentioned by us. *Wool v. Fleetwood,* 136 N. C., 460, at 470; *Whitesides v. Cooper,* 115 N. C., 570; *Mills v. Thorne,* 95 N. C., 362; *Ward v. Jones,* 40 N. C., 404. The language of the will in *Puckett v. Morgan,* and of the deed in *Jones v. Whichard,* is not materially different from that of the will in this case, and the three, therefore, should have the same construction, that the remainder is not to the heirs by descent from the first taker, but to them, as purchasers, under the will, the first taker having only a life estate.

The result is that the defendant has acquired the title under the children of Mrs. Blackledge by the *mesne* conveyances to him. This affirms the judgment.

Affirmed.