Controversy without action, submitted on an agreed statement of facts.
Plaintiff, being under contract to convey certain lands to the defendant, executed and tendered a deed therefor and demanded payment of the purchase price, as agreed. The defendant declined to accept the deed and refused to make payment, claiming that the title offered was defective.
Upon the facts agreed, the court, being of opinion that the deed tendered would convey a good title, gave judgment for the plaintiff; whereupon the defendant excepted and appealed.
The plaintiff derives title to the lands in question by devise from his father, John T. Hampton, and, on the facts agreed, the title offered was properly made to depend upon the construction of the following items in the will of John T. Hampton:
"Item Five: I lend unto my son Nathaniel Pierce Hampton the farm whereon he now lives, lying at the north end of Churches Island, also Piney Island land, and my right in Cedar Island, and also my right in the marshes, all of the above named lands and marshes I lend at my death, and also lend all of my lands at the death of my wife, Nancy, and I also give all of my tools to N. P. Hampton for life. *Page 15 
"Item Six: I give unto the lawful heirs of my son Nathaniel Pierce Hampton all of the lands and chattel property that belongs to me at the death of me and my wife, Nancy, and if my son should die without a bodily heir, then my property to go back into the Hampton family."
The case states that the wife of the testator has been dead for a number of years; that the plaintiff has one daughter, his only child, who married the defendant, R. A. Griggs; that plaintiff's daughter is still living, and is now the mother of three children, all living.
Plaintiff contends that under the foregoing provisions of his father's will, he holds a fee-simple title to the lands sought to be conveyed; while the defendant contends that under said provisions the plaintiff took only a life estate in the property so devised. The merits of these respective contentions depend upon the applicability or nonapplicability of the rule in Shelley's case.
Whatever reasons, pro and con, may have been advanced originally in support of the wisdom or impolicy of following the rule in Shelley's case, so far as the courts of North Carolina are concerned, this is no longer an open question. Starnes v. Hill, 112 N.C. 1. Much has been said in support of its adoption, and something in criticism; but, with us, it is a rule of property as well as a rule of law, and we must observe it wherever the facts call for its application. The Legislature alone may change it if it is thought to be unsuited to the needs of our day or to the industrial life of our times. It is one of the ancient landmarks, which the fathers have set in the law, as it relates to the subject of real property, and we should be slow to remove it. Prov., 22:28.
The rule itself is simple enough; but, in applying it to the variant facts of numerous cases, seemingly with some lack of uniformity, it has become a subject of much perplexity. This may be due, in a measure, to a want of appreciation of the full meaning and significance of some of the terms employed. When it is said "the word heirs is a word of limitation of the estate, and not a word of purchase," within the meaning of the rule inShelley's case, it is to be understood that the word "limitation" is used in the sense of marking out the bounds or describing the extent or quality of the estate conveyed to the ancestor or to the first taker; and the word "purchase" is to be understood as referring to an estate acquired in such a manner as to take it out of the ordinary course of descent, or as designating certain persons to take the estate who are themselves to become the root of a new inheritance or the stock of a new descent. As thus understood and construed, Lord Coke's definition of the rule would be substantially as follows:
When an ancestor, by any gift or conveyance, taketh an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee or in tail, the word "heirs" *Page 16 
is a word marking out the bounds or describing the extent or quality of the estate conveyed to the ancestor, and not a word designating the persons who are to take the estate, other than by descent and as the beginners of a new inheritance.
It is generally held that, as prerequisites to the application of the rule, there must be, in the first instance, an estate of freehold in the ancestor or the first taker; and (2) the ancestor must acquire this prior estate by, through, or in consequence of the same instrument which contains the limitation to his heirs; (3) the words "heirs" or "heirs of the body" must be used in their technical sense as importing a class of persons to take indefinitely in succession, from generation to generation, in the course marked out by the canons of descent; (4) the interest acquired by the ancestor and that limited to his heirs must be of the same character or quality; that is to say, both must be legal, or both must be equitable, else the two would not coalesce; and (5) the limitation to the heirs must be of an inheritance, in fee or in tail, and this must be made by way of remainder. See note, 29 L.R.A. (N.S.), 963; 24 R.C.L., 887.
It is further conceded by practically all the authorities that the rule in question is one of law and not one of construction, and that at times it overrides even the expressed intention of the grantor, or that of the testator, as the case may be. But when this is said, it should be understood as meaning that only the particular intent is sacrificed to the general or paramount intent. It is not the estate which the ancestor takes that is to be considered so much as it is the estate intended to be given to the heirs. As said in Baker v. Scott, 62 Ill. 88: "It has frequently been adjudged that though an estate be devised to a man for his life, or for his life et non aliter, or with any other restrictive expressions, yet if there be afterward added apt and proper words to create an estate of inheritance in his heirs or the heirs of his body, the extensive force of the latter words should overbalance the strictness of the former, and make him tenant in tail or in fee. The true question of intent would turn not upon the quantity of estate intended to be given to the ancestor, but upon the nature of the estate intended to be given to the heirs of his body." The first question, then, to be decided is whether the words "heirs" or "heirs of the body" are used in their technical sense; and this is a preliminary question to be determined, in the first instance, under the ordinary principles of construction without regard to the rule in Shelley's case. Not until this has been ascertained by first viewing the instrument form its four corners (Triplett v.Williams, 149 N.C. 394), and determining whether the heirs take as descendants or purchasers, can it be known in a given case whether the facts presented call for an application of the rule. "In determining whether the rule in *Page 17 Shelley's case shall apply, it is not material to inquire what the intention of the testator was as to the quantity of estate that should vest in the first taker. The material inquiry is, What is taken under the second devise? If those who take under the second devise take the same estate that they would take as heirs or as heirs of his body, the rule applies"; otherwise not. Crockett v. Robinson, 46 N. H., 454. The meaning or sense in which the words "heirs" or "heirs of the body" are employed, whether technical or other, is denominated the general or paramount intent, and this is to be the controlling factor. As against this dominant purpose the lesser or particular intent must give way; for having once determined that the second devise was intended to be given to the heirs of the first takerqua heirs, or in the strict and technical sense of heirs, the rule is inexorable. Hence, it appears that the effect of the rule is not to thwart, but to effectuate, the main intention and purpose of the grantor or donor.Yarnell's Appeal, 70 Pa. St., 335. See, also, the clear and instructive opinion by Montgomery, J., in Nichols v. Gladden, 117 N.C. 497.
Thus, in Nobles v. Nobles, 177 N.C. 243, it was held that a devise in a mother's will "to my son, Osborne C. Nobles, the home and buildings and one-half the land for his lifetime, and then to his legal representatives" conferred upon the devisee a fee-simple estate in the property under the rule in Shelley's case. Here, it will be observed, in searching for the dominant purpose and intent of the testator, the words "legal representatives" were held to be equivalent to or synonymous with "heirs" or "heirs of the body," giving rise to the application of the rule. In Lord Coke's definition, the word "heirs" is used, but it is generally held that equivalent expressions will suffice where it is patent from the context that such expressions were evidently intended to be used in the sense of heirs. Conversely, where the words "heirs" or "heirs of the body" are not used in a technical sense, the rule does not apply.
Again, in the case of Tyson v. Sinclair, 138 N.C. 24, there was a devise to Thomas B. Tyson "during the term of his natural life, then to the lawful heirs of his body, in fee simple, on failing of such lawful heirs of his body, then to his right heirs in fee," which was held to be a proper case for the application of the rule, as the limitation over to the right heirs did not change the course of descent, but showed that the words "lawful heirs of his body" were used in their technical meaning. To like effect, among others, is the case of Radford v. Rose, 178 N.C. 288.
The foregoing decisions are representative of those cases which may be said to be in the twilight zone, and in which the rule has been held to be applicable; but there is another line of cases, of seeming similarity *Page 18 
and likeness to those above, in which the rule has been held to be nonapplicable, and this has given rise to some difficulty in differentiating the two classes of cases.
In Puckett v. Morgan, 158 N.C. 344, the following devise was held to be outside the operation of the rule in Shelley's case: "I leave to Martha Morgan, the wife of James Morgan, 48 1/2 acres of land, known as the Rachel tract, on the east side, during her life, then to her bodily heirs, if any; but if she have none, back to her brothers and sisters." Here, it will be observed, the ulterior devise, upon the happening of the given contingency, provided that the estate should be taken out of the first line of descent, and then put back into the same line, in a restricted manner, by giving it to some, but not to all, of those who presumptively would have shared in the estate as being potentially among the heirs general of the first taker. Looking at the instrument from its four corners, and using this provision, among others, as one of the guides for ascertaining the paramount intent or the dominant purpose of the testator, it was held that the words "then to her bodily heirs, if any," were not used in their technical sense as importing a class of persons to take indefinitely in succession, generation after generation, but as meaning issue or children living at her death. Note this ulterior limitation did not undertake to substitute the root of a new and independent inheritance, under the contingency stated, for that of the first stock, as was the case in Morrisett v. Stevens, 136 N.C. 160. This distinction was clearly pointed out by Hoke, J., in Jones v. Whichard,163 N.C. 241, from which we copy without quoting literally: InMorrisett's case the ulterior disposition of the property was not, and was not intended as, a limitation on the estate conveyed to the first taker, but was a provision whereby one stock of inheritance, on a certain contingency, was substituted for another, the second to hold as purchaser direct from the grantor or original owner. Sessoms v. Sessoms,144 N.C. 121.
The decisions rendered in Puckett v. Morgan, supra, supported, among other cases, by Rollins v. Keel, 115 N.C. 68, was followed in Jones v.Whichard, 163 N.C. 241; Pugh v. Allen, 179 N.C. 307; Blackledge v.Simmons, 180 N.C. 535; Wallace v. Wallace, 181 N.C. 158, and Reid v.Neal, 182 N.C. 192.
In Pugh v. Allen, supra, p. 309, Mr. Justice Hoke, speaking of the line of demarcation which separates these two classes of cases, said: "Applying the principle, it has been held in several of our decisions construing deeds of similar import that in case of a limitation over on the death of a grantee or first taker without heir or heirs, and the second or ultimate taker is presumptively or potentially one of the heirs general of the first, the term `dying without heir or heirs' on the part of the grantee will be construed to mean, not his heirs general, but his issue *Page 19 
in the sense of children and grandchildren, etc., living at his death," citing Sain v. Baker, 128 N.C. 256; Francks v. Whitaker, 116 N.C. 518, and Rollins v. Keel, 115 N.C. 68.
Applying the above principles to the case at bar, we think it is clear that the words "lawful heirs of my son," appearing in item six of the will, were not used in their technical sense, but in the sense of issue or children, and that the plaintiff took only a life estate in the property with remainder to his children and grand children living at his death, in default of which, it is provided that the property shall go back into the Hampton family. Members of the Hampton family, of course, are potentially among the heirs general of the first taker, but they are not all, and this ulterior limitation would exclude others among his heirs who were not of the blood of the original stock. Hence, under this construction of the dominant intent of John T. Hampton, the testator, as expressed in his will, we think the rule in Shelley's case is nonapplicable.
The word "lend" in the will before us was manifestly intended to be used in the sense of give or devise. Cohoon v. Upton, 174 N.C. 88.
Reversed.