BEULAH STONE JONES AND HUSBAND, ROLAND JONES, AND EULA STONE HAYES v. DAVID S. STONE AND WIFE, LUCILLE M. STONE

No. 8011SC620

(Filed 16 June 1981)

1. **Rules of Civil Procedure § 41— refusal to dismiss action for failure to prosecute**

The trial court did not abuse its discretion in denying respondent's motion to dismiss petitioners' partition proceeding filed in 1970 for failure to prosecute where petitioners believed that their claim had been lost on the basis of information supplied to them by their original attorney; it was not until 1978 that petitioners found that such information was incorrect; and from that point forward, petitioners undertook diligent efforts to investigate their claim, hire new counsel, and proceed with a hearing of their claim on the merits.

Jones v. Stone

**2. Wills § 33.1— inapplicability of Rule in Shelley's case**

Where testator devised a life estate in realty to his son with the remainder "to be divided among [the son's] heirs at law," the Rule in Shelley's case did not apply to give the son fee simple title to the realty since the words "to be divided among" showed testator's intention to divide his property among his children's children not in accordance with the laws of intestate succession but rather as tenants in common and members of the same class.

APPEAL by respondents from *Britt, Judge.* Judgment entered 23 April 1980 in Superior Court, LEE County. Heard in the Court of Appeals 29 January 1981.

In a special proceeding to partition land, filed 3 July 1970, petitioners, Beulah Stone Jones and Eula Stone Hayes, allege that they are tenants in common with the respondent, David S. Stone, of approximately 19.28 acres in Lee County.[1] The property in question is part of a 145-acre tract owned by Neil A. Stone at the time of his death on 15 June 1937. Beulah Jones and Eula Hayes are the sisters of David Stone, and their claim to be tenants in common with David Stone arises under the Last Will and Testament of their grandfather, Neil A. Stone.

In Item Two of his Will, Neil A. Stone devised a life estate in his property to his wife, Nannie Catharine Stone. In Item Five of his Will, Neil A. Stone provided as follows:

I give, devise and bequeath to my son Samuel Temus Stone, to take effect after the death of my said wife, one-tenth in value, of all my real property to have and to hold the same during his natural life and after his death, the same *to be divided among his heirs at law.* (Emphasis added.)

In Items Three, Six, Seven, Eight, Nine, Ten and Twelve of his Will, Neil A. Stone used the same language he used in Item Five to devise a one-tenth interest in his property to seven of his nine other children, except he inserted the additional word "equally." Consequently, the remainder provision in Items Six, Seven, Eight, Nine, Ten and Twelve reads "and after [that child's]

---

1. Roland Jones, the husband of Beulah Stone Jones, is listed as a petitioner in this proceeding; Lucille M. Stone, the wife of David S. Stone, is listed as a respondent in this proceeding.

death the same to be equally divided among his [her] heirs at law."[2]

In July 1949, after the death of Nannie Catharine Stone, a special proceeding seeking an actual division of Neil A. Stone's real property was instituted before the Clerk of Lee County Superior Court. As a result of this special proceeding, Neil A. Stone's land was divided into ten separate tracts. The land allotted to Samuel Temus Stone in the partition proceeding of July 1949 consisted of 19.28 acres.

Samuel Temus Stone died on 15 May 1970 leaving, as his sole heirs, his daughters, the petitioners herein, and his son, the respondent herein. To the petition alleging that Beulah Jones and Eula Hayes are equal tenants in common with him, David Stone filed an Answer asserting that under the Last Will and Testament of his father, Samuel Temus Stone, he was devised a fee simple interest in said land. David Stone contends that his father, prior to his death in 1970, was vested with fee simple title to said land by virtue of the Rule in Shelley's case.

The petition to partition was filed by petitioners' original attorney on 3 July 1970. On 1 June 1979 petitioners filed a Notice of Substitution of Counsel. On 11 June 1979 the respondent filed a motion to dismiss for failure to prosecute pursuant to Rule 41(b) of the Rules of Civil Procedure. The motion was denied at the 28 January 1980 civil session of Lee County Superior Court. This case was heard by the court without a jury at the 21 April 1980 civil session of Lee County Superior Court. From the court order concluding that Beulah Jones, Eula Hayes and David Stone were "equal tenants in common of said 19.28 acre tract of real property, each of said persons owning one-third undivided interest in and to said real property" and further finding that petitioners were entitled to a partition sale as prayed for in their petition, respondent appealed.

2. Neil A. Stone also devised a life estate to his two other children in Items Four and Eleven of his Will, but the remainder in Item Four was to be equally divided among Neil A. Stone's other children, and the remainder in Item Eleven was to go to the named son who took care of the infirmed life tenant.

*Love & Wicker, P.A., by Jimmy L. Love, for respondent appellants.*

*Randall, Yaeger, Woodson, Jervis & Stout, by Robert B. Jervis, and McCain and Moore, by Grover C. McCain, Jr., for petitioner appellees.*

BECTON, Judge.

## I

[1]  Respondent first contends that the trial court erred in refusing to grant his motion to dismiss for failure to prosecute pursuant to G.S. 1A-1, Rule 41(b). We disagree.

Under the North Carolina Rules of Civil Procedure, Rule 41(b), a petitioner's claim can be dismissed with prejudice if the petitioner fails to prosecute the action. Indeed, courts have inherent power to dismiss stale actions on their own motion. *Link v. Wabash Railroad Company,* 370 U.S. 626, 8 L.Ed. 2d 734, 82 S.Ct. 1386, *reh. denied,* 371 U.S. 873, 9 L.Ed. 2d 112, 83 S.Ct. 115 (1962). However, a "mere lapse of time does not justify dismissal if the plaintiff [petitioner] has not been lacking in diligence." *Green v. Eure,* 18 N.C. App. 671, 672, 197 S.E. 2d 599, 600 (1973). Courts are, and should be, primarily concerned with trial of cases on their merits. "Dismissal for failure to prosecute is proper only [when] the plaintiff manifests an intention to thwart the progress of the action to its conclusion, or by some delaying tactic plaintiff fails to progress the action toward its conclusion." *Id.* at 672, 197 S.E. 2d at 601.

In this case, the affidavit of the petitioner Beulah Jones discloses that she believed her claim, and the claim of her sister, had been lost based on information supplied to her by her original attorney. It was not until Ms. Jones heard of a similar action filed in the fall of 1978 that she had reason to believe that the information supplied to her by her original attorney was incorrect. From that point forward, petitioners undertook diligent efforts to investigate their claim, hire new counsel, and proceed with a hearing of their claim on the merits. The record does not suggest that petitioners deliberately proceeded in dilatory fashion. It was after petitioners filed a motion for substitution of counsel and after they requested that the case be set for trial that respondent came forward with the motion to dismiss for failure to prosecute.

Dismissal under Rule 41(b) is within the discretion of the trial court. The trial court heard the testimony of the original attorney and reviewed the affidavit of Ms. Jones, and upon that evidence it failed to find that petitioners were delaying this action or otherwise attempting to thwart its progress toward trial. The decision of the trial court, denying respondent's motion, should therefore not be disturbed.

## II

**[2]** Respondent next contends that the Rule in Shelley's case gave his father, Samuel Temus Stone, a fee simple estate and that he, David Stone, owns all of the land by virtue of his father's conveyance to him.

This year marks the 400th anniversary of the formal pronouncement of the Rule in Shelley's case (Rule).[3] The Rule is a vestige of feudal law and takes its name from an old English case, *Wolfe v. Shelley*, 1 Co.Rep. 93(b), 76th Eng. Rep. 206 (CB 1581). In North Carolina, the Rule is most often stated as follows:

> When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without interposition of another estate, of an interest of the same legal or equitable quality to his heirs, or heirs of his body, as a class of persons to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate.

*Jones v. Whichard*, 163 N.C. 241, 243, 79 S.E. 503, 504-05 (1913); *White v. Lackey*, 40 N.C. App. 353, 355, 253 S.E. 2d 13, 15, *disc. rev. denied*, 297 N.C. 457, 256 S.E. 2d 810 (1979). A shorter, and perhaps easier to grasp, explanation of the Rule is set forth in *Martin v. Knowles*, 195 N.C. 427, 142 S.E. 313 (1928):

> If an estate of *freehold* be limited to A, with *remainder* to his heirs, general or special, the remainder, although importing an independent gift to the heirs, as original takers, shall confer the inheritance on A, the ancestor.

---

3. The principle, however, was part of the common law of England long before 1581. "The principle known as the Rule in Shelley's Case had its origin as early as the reign of Edward II, in 1324." Webster, *A Relic North Carolina Can Do Without—The Rule in Shelley's Case*, 45 N.C. L.Rev. 3, 4 n. 4 (1966).

*Id.* at 429, 142 S.E. at 313.

Although the original objective of the Rule became outdated when feudal tenures were abolished in the seventeenth century, the Rule enjoyed prominence until the twentieth century. The Rule was abolished in England in 1925; it has never been repealed in North Carolina, however. Indeed, one year after the Rule was abolished in England, the North Carolina Supreme Court said:

> Today, the rule serves quite a different, but no less valuable, purpose, in that it prevents the tying up of real estate during the life of the first taker, facilitates its alienation a generation earlier, and at the same time, subjects it to the payment of the debts of the ancestor.

*Benton v. Baucom,* 192 N.C. 630, 632, 135 S.E. 629, 630 (1926).

In order for the Rule to apply, all of the following factors must exist:

> (1) there must be an estate of freehold in the ancestor; (2) the ancestor must acquire that estate in the same instrument containing the limitation to his heirs; (3) the words 'heirs' or 'heirs of the body' must be used in the technical sense meaning an indefinite succession of persons, from generation to generation; (4) the two interests must be either both legal or both equitable; and (5) the limitation to the heirs must be a remainder in fee or in tail.

*White v. Lackey,* 40 N.C. App. at 356, 253 S.E. 2d at 15-16. *See also Benton v. Baucom; Hampton v. Griggs,* 184 N.C. 13, 113 S.E. 501 (1922).

When all of the required elements are present, the Rule applies regardless of the intent of the testator, the Rule being "one of law and not one of construction." 184 N.C. at 16, 113 S.E. at 502.

In applying the Rule, courts have not always been bound by the words "to A for life, remainder to A's heirs" or similar words. Indeed, much of the litigation under the Rule concerns the courts' attempts to ascertain the paramount intent of testators who use the word "heirs." The Rule at times

overrides even the expressed intention of the grantor, or that of the testator, as the case may be. But when this is said, it should be understood as meaning that only the particular intent is sacrificed to the general or paramount intent. It is not the estate which the ancestor takes that is to be considered so much as it is the estate intended to be given to the heirs. . . . 'The true question of intent would turn not upon the quantity of estate intended to be given to the ancestor, but upon the nature of the estate intended to be given to the heirs of his body.' The first question, then, to be decided is whether the words 'heirs' or 'heirs of the body' are used in their technical sense; and this is a preliminary question to be determined, in the first instance, *under the ordinary principles of construction without regard to the rule in Shelley's case.* Not until this has been ascertained by first viewing the instrument from its four corners (*Triplett v. Williams*, 149 N.C., 394), and determining whether the heirs take as descendants or purchasers, can it be known in a given case whether the facts presented call for an application of the rule. . . . The meaning or sense in which the words 'heirs' or 'heirs of the body' are employed, whether technical or other, is denominated the general or paramount intent, and this is to be the controlling factor. (Emphasis added.)

*Id.* at 16-17, 113 S.E. at 502.

In an old Kentucky case, *Prescott v. Prescott,* 49 Ky. (10 B. Mon.) 56, 58 (1849), the court said:

It is true, the words 'heirs of the body,' are appropriate words of limitation . . . [b]ut it is also well settled by numerous decisions, that not only heirs of the body, but the more general word 'heirs,' or the more specific terms 'heirs male, or heirs female of the body,' or of 'two bodies,' may be used and operate as words of purchase. It is a question of intention whether these words are used to denote the whole line of heirs of the sort described to take in succession as such heirs, or to denote only a particular person, or a class of persons who are to come under that description at the time. When used in the former sense, they are words of limitation, defining or limiting the previous estate to which they apply. When used in the latter sense, they operate merely as

*designatio personoe*, or *personarum*, and are held to be words of purchase, giving a new estate to the persons designated.

We must determine in this case if the testator, Neil A. Stone, intended the words "heirs at law" to mean the indefinite succession of persons from generation to generation taking as if by intestacy. If he did, the Rule applies because those words would be "words of limitation" as contra-distinguished from "words of purchase." Webster, *supra*, at 11. If, however, Neil A. Stone used the words "heirs at law" to designate certain individuals who are only a part, and not all, of the heirs of the first taker or used the words to describe heirs of the first taker at a particular time, then the Rule does not apply. Neil A. Stone would not have been using the words "heirs at law" in the technical sense, and therefore the heirs would take a per capita remainder interest in the property by "purchase" as tenants in common. *Welch v. Gibson*, 193 N.C. 684, 138 S.E. 25 (1927); *Gilmore v. Sellars*, 145 N.C. 283, 59 S.E. 73 (1907); *Faison v. Odum*, 144 N.C. 107, 56 S.E. 793 (1907); *Jenkins v. Jenkins*, 96 N.C. 254, 2 S.E. 522 (1887); *Mills v. Thorne*, 95 N.C. 362 (1886); *White v. Lackey.*

In determining the preliminary question — Neil A. Stone's intent — we are guided by "the ordinary principles of construction [in will cases] without regard to the [R]ule," *Hampton v. Griggs*, 184 N.C. at 16, 113 S.E. at 502. It has long been the rule that the intent of a testator is to be ascertained, if possible, based on a consideration of his Will from its four corners; that to effectuate the intention of the testator, the court may disregard or supply punctuation, as well as transpose words, phrases or clauses; and that words, phrases or clauses will be supplied in the construction of a Will when the sense of the phrase or clause in question, as collected from the context, manifestly requires. *Elmore v. Austin*, 232 N.C. 13, 59 S.E. 2d 205 (1950); *House v. House*, 231 N.C. 218, 56 S.E. 2d 695 (1949); *Cannon v. Cannon*, 225 N.C. 611, 36 S.E. 2d 17 (1945); *Williams v. Rand*, 223 N.C. 734, 28 S.E. 2d 247 (1943). As stated in the case of *Coppedge v. Coppedge*, 234 N.C. 173, 66 S.E. 2d 777 (1951):

[i]n construing a will, the entire instrument should be considered; clauses apparently repugnant should be reconciled and effect given where possible to every clause or phrase and to every word. 'Every part of a will is to be considered in its

construction, and no words ought to be rejected if any mean-
ing can possibly be put upon them. Every string should give
its sound,' [citations omitted]. But, where provisions are in-
consistent, it is a general rule in the interpretation of wills,
to recognize the general prevailing purpose of the testator
and to subordinate the inconsistent provisions found in it.
*Snow v. Boylston*, 185 N.C. 321, 117 S.E. 14 [1923]; *Tucker v.
Moye*, 115 N.C. 71, 20 S.E. 186 [1894]; . . .

234 N.C. at 176, 66 S.E. 2d at 779.

Having discussed the required elements for application of the
Rule; the technical meaning of the words "heirs at law"; and the
standards established by our courts in construing a Will, we now
apply these rules to Neil A. Stone's use of the words "heirs at
law."

In Item Five of his Will, Neil A. Stone gave a life estate to
his son, Samuel Temus Stone, and provided that the remainder
was "to be divided among [Samuel Temus Stone's] heirs at law."
We believe the superadded words—"to be divided among"—are
sufficient to take the devise out from under the Rule.

Professor Webster in his article on the Rule states it dif-
ferently:

To evade the possibility of running afoul of the Rule in
Shelley's Case, all that is needed is some slight contextual
language in the dispositive instrument that will indicate to
the court that the words 'heirs' or 'heirs of the body' mean
less than the whole body of heirs who would take in in-
definite succession.

Webster, *supra*, at 13.

The court and Professor Webster find support in *Welch v.
Gibson*, 193 N.C. 684, 138 S.E. 25 (1927), in which our Supreme
Court distinguished the English rule from the North Carolina rule
with regard to the superadded words "equally to be divided" or
"share and share alike":

It has been held in England, ever since the leading case of
*Wright v. Jesson*, in the House of Lords, 2 Bligh., 2, which
overruled *Doe v. Wright*, in the King's Bench, 5 M. and S.,
95, that the words 'equally to be divided,' or 'share and share

alike,' superadded to the limitation to the heirs, or to heirs of
the body, do not prevent the application of the rule, and such
was declared to be the law of this State in *Ross v. Toms*, 15
N.C., 376, a case decided prior to the Act of 1784, now C.S.,
1734. But in *Ward v. Jones*, 40 N.C., 400, decided in 1848, and
expressly followed with approval in *Mills v. Thorne*, 95 N.C.,
362, *Gilmore v. Sellars*, 145 N.C., 283, and *Haar v. Schloss*,
169 N.C., 228, it was held "that in all devises of land, made
since that time (1784), the words 'to be equally divided' pre-
vent the application of the rule in *Shelley's case*, and that the
first taker has only an estate for life."

193 N.C. at 689, 138 S.E. at 27. This premise in *Welch v. Gibson* is
so well established that respondent concedes had the additional
word "*equally*" been used in Item Five of Neil A. Stone's Will the
Rule would not apply. Our reading of the North Carolina cases
suggests that the words "to be divided among," even without the
word "equally," defeat the application of the Rule. Indeed, in
*Mills v. Thorne*, 95 N.C. 362 (1886), the North Carolina Supreme
Court, citing as authority, H. Theobald, A Concise Treatise on the
Law of Wills, (2d ed. 1881), said: "It is laid down that words of
division or distribution, such as '*to be divided*,' or '*equally*,' or
'*between*,' or '*amongst*,' or '*share*,' *or similar words*, make a tenan-
cy in common." *Mills v. Thorne*, 95 N.C. at 365. When heirs take
as tenants in common rather than as heirs in the line of succes-
sion, the Rule does not apply.

In addition to the superadded words which constitute "slight
contextual language in the dispositive instrument" indicating that
the words "heirs at law" were not used in a technical sense, Neil
A. Stone's entire scheme of distribution suggests that the words
"heirs at law" were merely *descriptio presonarum* of those per-
sons who were to receive a remainder interest in the property
after the death of Samuel Temus Stone. The entire Will of Neil A.
Stone incorporated a per capita division and distribution of his
estate. After the death of Nannie Catharine Stone, each of the
children of Neil A. Stone was given a lifetime interest in one-
tenth of his real property. Upon the death of each child, their one-
tenth interest was to be divided among their heirs at law. Neil A.
Stone used the word "equally" in every item of his Will except
Item Five. Thus respondent concedes that the words "heirs at
law" as used by Neil A. Stone in the Third, Sixth, Seventh,

Eighth, Ninth, Tenth and Twelfth Items of his Will were not intended by the Testator to be used in their technical sense as is required for application of the Rule. Respondent relies heavily upon the absence of the word "equally" in the Fifth Item of the Will to support his position. In doing so, respondent completely misses the point which was established by *Mills v. Thorne*, and *Welch v. Gibson*. It is not the presence or absence of one particular word in one particular paragraph of the Will which determines whether the Rule will apply, but rather it is the intent of the testator in his use of the word "heirs," gleaned from the entire dispositive instrument and considered in the light of the superadded words which are present to disclose that intent.

The trial court's finding that the word "heirs" should be interpreted consistently throughout the Will as words merely *descriptio personarum*, and that therefore the Rule has no application, is entirely proper under the decisions of our court in *Williams v. Rand; Cannon v. Cannon; Elmore v. Austin; House v. House;* and *Coppedge v. Coppedge*. We hold that the superadded words "to be divided among" are sufficient to prevent the operation of the Rule, and are consistent with Neil A. Stone's design to divide his property among his children's children not in accordance with the laws of intestate succession, but rather as tenants in common and members of the same class. Therefore, the judgment appealed from is

Affirmed.

Chief Judge MORRIS and Judge VAUGHN concur.